

**Dated: October 10, 2017.**

_____
**TONY M. DAVIS
UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 12-12371-TMD |
| MICHAEL EDWARD QUIGLEY | § | |
| FRANCINE GILMORE QUIGLEY, | § | |
| Debtors. | § | Chapter 7 |

### MEMORANDUM OPINION

A group of individuals and entities, including Denise and Schuler Page, have moved to reopen this bankruptcy case. Their motion was prompted by a lawsuit filed against them in state court by Clubquig II, an entity controlled by Mr. Quigley, one of the Debtors. In that lawsuit, Clubquig II seeks damages for, and injunctive relief against, the Pages' allegedly unauthorized use of intellectual property; specifically, the trademark "Gumbo's."

The Pages argue that the mark was not properly valued in the bankruptcy case, and that a license that they held to the mark was not disclosed at all. They contend that by not disclosing

1

the license, and by valuing the company that owned the mark as worthless, the Debtors actively misled the Chapter 7 Trustee.[1]

I. **FACTS**

From the records of the U.S. Patent and Trademark office, it appears that the mark "Gumbo's, A Louisiana Style Café" has been in existence since 1999, and was assigned to various entities owned by Mr. Quigley starting in 2003.[2] While the Quigleys were in bankruptcy, the mark was owned by LRTCL, LLC, a company partly owned by Mr. Quigley.[3] In addition, Clubquig II registered a second mark, "Gumbo's," in 2010.[4] About a year ago, and three years after the bankruptcy was closed, those entities assigned both marks to Mr. Quigley.[5]

Although not entirely clear from the testimony, it appears the Quigleys opened several restaurants, including three that used one or both Gumbo's marks.[6] At some point, Mr. Quigley's business partner embezzled $1 million from the companies, and that loss of capital caused the restaurants to founder.[7] The first was lost in 2009, and a second was sold in late 2011 (about a year prior to bankruptcy) for enough money to pay off tax and other debts owed by the Quigleys.[8] The third Gumbo's was sold to the Pages a few months prior to bankruptcy, again, for enough money to pay off accumulated debt.[9]

In their bankruptcy schedules, the Quigleys listed Clubquig II and LRTCL, LLC as being "inactive," and as being worthless.[10] In their statement of financial affairs, they listed LRTCL,

---

[1] What the Pages hope to gain by reopening the case is unclear. If the case is reopened, and the Trustee chooses to administer the mark, the Trustee will substitute in as party plaintiff in the state court suit and the Pages will face the same problem they face now.
[2] Hr'g on Mot. to Reopen Chapter 7 Case, Movant's Ex. 12, at 24-26.
[3] *Id.* at 25.
[4] *Id.* at 22-23.
[5] *Id.* at 23, 26.
[6] Hr'g on Mot. to Reopen Chapter 7 Case, Quigley Testimony.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Schedule B at 15, ECF No. 1.

LLC as the holder of the Gumbo's mark, and as being in business from "2/10—current."[11] Together, the information in the schedules and the statement of financial affairs constituted a representation by the Quigleys that the "Gumbo's" mark was worthless.

However, in existence at that time of the bankruptcy, but not disclosed, was a license agreement between Clubquig II and the Pages that gave the Pages the right to use the mark.[12] Of course, Clubquig II was not the Debtor, and so the Quigleys were not required to disclose the license. In addition, the royalty payable under the license agreement was 0%.[13] Mr. Quigley testified that although a market rate would be 2%, he charged 0% to the Pages because he was helping them make a go of the restaurant and so did not want to impose an additional financial burden on them, but still wanted to protect their use of the mark.[14] Evidently, the Pages were ultimately successful in using the mark in the restaurant they bought from the Quigleys because the suit in state court alleges that they exceeded the scope of the license by opening a second Gumbo's restaurant.[15]

At the meeting of creditors, Mr. Quigley was closely questioned by the Trustee about his various restaurants.[16] In response to these questions, Mr. Quigley disclosed that he had a consulting agreement to help the Pages run the restaurant they bought from the Quigleys.[17] He did not disclose the license agreement but also was not asked about it. He did testify that LRTCL owned the Gumbo's mark.[18] The exchange went as follows:

> MR. OSHEROW: LRT -- LRTCL?

---

[11] Am. Statement of Financial Affairs at 8, ECF No. 9.
[12] Mot. to Reopen Case, Ex. B, at 11-19, ECF No. 43-2.
[13] Mot. to Reopen Case, Ex. B, at 15, ECF No. 43-2.
[14] Hr'g on Mot. to Reopen Chapter 7 Case, Quigley Testimony.
[15] *Id.* at 3-4.
[16] Hr'g on Mot. to Reopen Chapter 7 Case, Movant's Ex. 3, at 10:19-19:21 (Testimony from Nov. 21, 2012 Meeting of Creditors).
[17] *Id.* at 13:19-15:6.
[18] *Id.* at 16:18-17:12.

> MR. QUIGLEY: -- CL. That's Lauren, Rachel, Trent -- I forget his sons' names. That's still in existence. That's -- has the Gumbo's mark, the trademark.
> MR. OSHEROW: Uh-huh.
> MR. QUIGLEY: And it's -- we own 50 percent of that.
> MR. OSHEROW: Does it do any business or is it just on a --
> MR. QUIGLEY: We just purely formed it to have a place to -- to place between the two of us, Francine and I and the other owner, to have a place to park the trademark.
> MR. OSHEROW: Okay.
> MR. QUIGLEY: It does nothing. It receives no money from --
> MR. OSHEROW: Have you ever opened a bank account or done anything like that?
> MR. QUIGLEY: No, sir.[19]

## II. ANALYSIS

The Pages note that the mark was owned by LRCTL, but the license was in the name of Clubquig II. They also note that all these entities were listed as being worthless, and that the license was not disclosed. According to the Pages, these facts all indicate an attempt by Quigley to play a shell game and hide the value of the Gumbo's mark. They claim that the mark was property of the estate, and if the Trustee had known the true value of the mark, he would have administered it.

The threshold issue is whether the mark is an asset that was abandoned when the case closed. The Bankruptcy Code states that "[u]nless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor."[20]

During the hearing on the motion to reopen, the lawyers for both sides agreed that the Chapter 7 Trustee was informed about the lawsuit and elected not to seek to reopen the case. In addition, the Trustee's counsel was in the courtroom, but did not take a position on the motion. Counsel for the U.S. Trustee was also in the courtroom, but did not appear or take a position.

---

[19] H'rg on Mot. to Reopen Chapter 7 Case, Movant's Ex. 3, at 16:18-17:12.
[20] 11 U.S.C. § 554(c).

There are two Gumbo's marks, both of which are currently owned by Mr. Quigley. But during the bankruptcy case, one was owned by Clubquig II, and the other by LRTCL. The disclosures made during the case did not reveal the one owned by Clubquig II. From this confusion, the Pages imputed a nefarious scheme on the part of Mr. Quigley. To be sure, the two marks created confusion, both for the Pages when they were sued by Clubquig II, and during the recent hearing, where no one seemed to realize that there were two marks.

But the essential facts were disclosed and discussed at the meeting of creditors. The Gumbo's marks were owned by entities that were in turn owned by the Quigleys. Of the three Gumbo's restaurants, one failed, one was converted on sale to an Italian restaurant, and the last—the one acquired by the Pages just before the bankruptcy—was struggling. Given these facts, the Trustee's lack of interest in trying to monetize the mark is perfectly understandable. Trustees must make the best business judgment they can on how to allocate their time and energy, and it makes no sense to second-guess the judgment made by the Trustee here, particularly using 20-20 hindsight with knowledge of facts—the Pages' success in opening a second Gumbo's—not available to anyone at the time the Trustee made his decision. Thus, when the case was closed, the Trustee left the asset unadministered, effectively abandoning the mark to the Quigleys.[21]

Granted, not much cause is needed to reopen a case.[22] Particularly where a debtor may have hidden or not fully disclosed an asset, courts are not hesitant to grant a motion to reopen.[23] Frequently, the trustee appointed in a closed case will move to reopen to administer assets that

---

[21] 11 U.S.C. § 554(c).
[22] *See* 11 U.S.C. § 350(b) ("A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."); *see also Dorsey v. U.S. Dep't of Education (In re Dorsey)*, No. 16-31085, 2017 WL 3821248, at *3 (5th Cir. 2017) (quoting *Citizens Bank & Tr. Co. v. Case (In re Case)*, 937 F.2d 1014, 1018 (5th Cir. 1991)) ("The phrase 'or for other cause' as used in § 350(b) is a broad term which gives the bankruptcy court discretion to reopen a closed estate or proceedings when cause for such reopening has been shown.").
[23] *Kane v. National Union Fire Ins. Co. (In re Kane)*, 535 F.3d 380, 385 (5th Cir. 2008).

5

have just come to his or her attention. On occasion, the U.S. Trustee will seek to reopen a case so that newly discovered assets can be administered. When she does so, she usually appoints the same person who served as trustee while the case was open.

The key is whether the asset is newly discovered, or was abandoned. Here, the asset was abandoned. The Court construes the Pages' argument, therefore, as a motion to reopen to revoke abandonment and administer the mark. Though revocation of abandonment is at the discretion of the court, it is typically only "appropriate when the trustee is misled by false or incomplete information."[24] Here, the Trustee was not so misled.

Quigley disclosed LTRCL in the schedules, and the Trustee had an opportunity to investigate during the 341 meeting. Further, as stated by the Tenth Circuit B.A.P. in *Russell v. Tadlock*: "[w]e also recognize the need for finality in bankruptcy cases and the need for debtors to rely on the conclusiveness of bankruptcy proceedings as they move beyond bankruptcy."[25] Because there was no shell game and because of the need for finality in bankruptcy, revocation is not proper here.

More importantly, the Trustee seems fine with his decision, even now. He was told about the recent state court suit, and chose not to seek to reopen. Although the Trustee did not testify at the hearing, his decision not to act spoke loudly. It makes no sense to second-guess this decision, either.

### III. CONCLUSION

The motion to reopen will be denied by separate order.

---

[24] *Vasquez v. Adair (In re Adair)*, 253 B.R. 85, 89 (B.A.P. 9th Cir. 2000); *see also Russell v. Tadlock (In re Tadlock)*, 338 B.R. 436, 439 (B.A.P. 10th Cir. 2006) ("[O]nce scheduled property is abandoned, it is not cause to reopen the case to vacate the order of abandonment.").

[25] *In re Tadlock*, 338 B.R. at 439.